UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

WIII UPTOWN, LLC

MISCELLANEOUS ACTION

VERSUS

NO. 15-51-BAJ-EWD

B&P RESTAURANT GROUP, LLC

### RULING ON MOTION TO QUASH

Before the court is a Motion to Quash WIII Uptown, LLC's Subpoenas to Attorney of Record Chad Grand and Fraud Investigator and Non-Testifying Expert D. Scott Johnson (the "Motion to Quash").[1]  The Motion to Quash was filed by B&P Restaurant Group, LLC ("B&P").  WIII Uptown, LLC ("WIII") has filed an Opposition,[2] and B&P has filed a Reply.[3]  For the reasons set forth herein, the Motion to Quash is **GRANTED** as to the deposition of Chad Grand and **DENIED** as to the deposition of D. Scott Johnson.  B&P's request for oral argument[4] is **DENIED AS MOOT**.

I.     **Background**

This miscellaneous action was opened to quash deposition subpoenas issued to Chad Grand ("Grand") and D. Scott Johnson ("Johnson").[5]  Mr. Grand is an attorney of record for B&P.  B&P

---

[1] R. Doc. 1.

[2] R. Doc. 15.

[3] R. Doc. 16.

[4] *See*, R. Doc. 1, p. 1.

[5] Mr. Grand's deposition subpoena is attached to the Motion to Quash as Exhibit 1.  R. Doc. 1-2.  Mr. Johnson's deposition subpoena is attached to the Motion to Quash as Exhibit 2.  R. Doc. 1-3.  The parties have apparently agreed to continue the deposition dates identified in Grand's and Johnson's subpoenas until after the court rules on the Motion to Quash.  R. Doc. 1-1, p. 5.  WIII has also noticed the depositions of B&P's principal, Michael Buchert, and B&P's Rule 30(b)(6) deposition.  R. Docs. 1-9, 1-10.  Based on an email communication between counsel for the parties attached to the Motion to Quash, it appears that the parties have agreed to wait until after a ruling on the Motion to Quash to conduct these depositions as well.  R. Doc. 1-11.

asserts that Mr. Johnson is "an associate certified fraud examiner who Grand hired as a consulting expert and fraud investigator."[6]  B&P seeks to quash both deposition subpoenas.[7]

The underlying action giving rise to WIII's subpoenas is a trademark cancellation proceeding initiated by WIII against B&P pending before the United States Patent and Trademark Office ("USPTO") Trademark Trial and Appeal Board (the "Cancellation Proceeding").[8]  B&P "owns a federal trademark registration for the mark THE RUM HOUSE, U.S. Trademark Reg. No. 3,776,555 ('the '555 registration')…."[9]  WIII seeks to cancel B&P's '555 registration based on its position that it is the owner of the mark THE RUM HOUSE (the "Mark") and that it uses the Mark in connection with the operation of The Rum House tavern in the Times Square section of New York City ("The Rum House New York").[10]  In the Cancellation Proceeding, in addition to asserting it has a senior right to use the Mark based on, *inter alia*, a purported assignment of rights, WIII also alleges that B&P fraudulently obtained the '555 registration.

### A.  Assignment of Rights from Tejo Lounge, Inc. to WIII

WIII alleges that from 1973 until 2010, The Rum House New York was operated by Tejo Lounge, Inc. ("Tejo"), and that Tejo "assigned all of its rights" in the Mark to WIII effective

---

[6] R. Doc. 1, p. 1.

[7] B&P has requested oral argument and has presented a proposed order that would require WIII to provide written questions it would pose to deponents.  R. Doc. 1-16.  The court does not find oral argument is necessary.  Because the court agrees that the Motion to Quash should be granted as to Mr. Grand, it is not necessary to review proposed written questions.  *See*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 210 (5th Cir. 1999) ("District courts typically review written questions to be posed to counsel….")  Finally, despite B&P's request, it has provided no authority to support its position that written questions proposed for Mr. Johnson's deposition should be considered prior to this court ruling on the Motion to Quash.

[8] WIII Uptown, LLC v. B&P Restaurant Group, LLC, Cancellation No. 92059889, United States Patent and Trademark Office, Trademark Trial and Appeal Board.  There is no district court litigation between the parties.  *See*, R. Doc. 1-1, p. 1.

[9] R. Doc. 1-1, p. 1.  *See also*, R. Doc. 1-4 (WIII's First Amended Petition for Cancellation).

[10] R. Doc. 1-4, ¶ 1.

2

October 7, 2010.[11]  Accordingly, WIII's position is that at the time B&P applied for and obtained the '555 registration, WIII's predecessor, Tejo, had superior legal rights in the Mark.[12]

As an affirmative defense in the Cancellation Proceeding, B&P has asserted that WIII defrauded Tejo.[13]  According to B&P, "WIII maintains that in 2010 in paid Tejo $2,000 – with two $1,000 checks – in exchange for Tejo's trademark rights….While WIII admits it does not have copies of the checks…it will neither admit nor deny whether its attorney, Elke Hofmann, actually delivered them to Tejo's then owner, Robert Rosecrans…or whether Rosecrans ever deposited them."[14]  B&P asserts that as part of its investigation into WIII's claims, Grand retained Johnson, "who is an associate certified financial fraud examiner and who previously worked as a Financial Crimes Investigator for the Louisiana State Office of Financial Institutions" and who is "also a licensed private investigator."[15]  B&P explains that both Grand and Johnson contacted Thai Dang ("Dang"), who was Tejo's last known bar manager and grandson of Tejo's now deceased owner.[16]  B&P contends that, despite WIII's claim that it purchased Tejo's trademark rights, "[i]n transcripts of conversations between Johnson and Dang, Dang flatly denied WIII's version of events" and

---

[11] R. Doc. 1-4, ¶ 2.

[12] *See*, R. Doc. 15, p. 4. ("In 2009, while Tejo Lounge was still operating THE RUM HOUSE in New York, [B&P] opened a restaurant and bar known as THE RUM HOUSE CARIBBEAN TAQUERIA in New Orleans, Louisiana. On October 19, 2009, again while Tejo Lounge was still operating THE RUM HOUSE in New York, [B&P] applied for a federal service mark registration for the mark THE RUM HOUSE in connection with restaurant and bar services.").  *See also*, R. Doc. 1-4, ¶ 25 ("As [WIII's] predecessor had been continuously operating THE RUM HOUSE in Times Square since 1973, over thirty years before [B&P's] establishment opened, [WIII's] predecessor had legal rights superior to [B&P's] at the time [B&P's application] was filed.").

[13] R. Doc. 1-1, p. 2.

[14] R. Doc. 1-1, pp. 5-6 (internal citations omitted).  *See also*, R. Doc. 1-5, p. 5 (B&P's Answer to Petition for Cancellation).

[15] R. Doc. 1-1, p. 2.

[16] R. Doc. 1-1, p. 2.

further asserts that Dang "reaffirmed that WIII's version of events were untrue" in Tejo's corporate deposition.[17]

In response, WIII argues Johnson and Grand communicated directly with Dang and that these communications ultimately influenced Dang's deposition testimony.[18]  WIII acknowledges that the email communications between Grand and Dang, as well as transcripts of the telephone calls between Johnson and Dang, have been produced in discovery.[19]  According to WIII, a review of the transcripts of the telephone conversations between Johnson and Dang show that "Johnson asked leading questions of Dang and misrepresented facts to Mr. Dang in an effort to get Mr. Dang to say what [B&P] wanted him to say.  Those misrepresentations and leading questions weaken Mr. Dang's statements within those transcripts…."[20]  WIII argues that it is entitled to depose both Grand and Johnson as the "sole source[s]" of the "underlying facts (if any) supporting the statements which Johnson and Grand made to Mr. Dang."[21]

### B.  Alleged Fraud in Obtaining B&P's '555 Registration

WIII also claims that B&P fraudulently obtained the '555 registration and therefore B&P's registration should be cancelled.[22]  Specifically, WIII points to the sworn declaration submitted in conjunction with B&P's application to register the Mark (the "Application") "signed by its current

---

[17] R. Doc. 1-1, p. 2.

[18] *See*, *e.g.*, R. Doc. 15, p. 9 (WIII asserts that although Johnson was "allegedly retained as a private investigator," he was actually "retained to feed Mr. Dang misinformation in order to alter his sworn understanding of the relevant facts").  Based on the documents submitted in conjunction with B&P's Motion to Quash and WIII's opposition, a "Nunc Pro Tunc Service Mark Agreement" purporting to assign rights in the Mark to WIII effective October 7, 2010 was signed by Mr. Dang on July 3, 2014.  R. Doc. 7, Exhibit C.  It appears telephone conversations between Johnson and Dang took place on August 1, 2014 and August 7, 2014.  R. Doc. 17.  Dang's deposition, both individually and as the corporate representative of Tejo took place May 21, 2015.  R. Doc. 1-7.

[19] R. Doc. 15, pp. 5-6.

[20] R. Doc. 15, p. 11.

[21] R. Doc. 15, pp. 11 & 12.  WIII does not specifically state what "underlying facts" it seeks.

[22] R. Doc. 1-4, Count III, ¶¶ 23-37.

attorney, Chad A. Grand, Esq., to the USPTO stating, in part, that to the best of the **declarant's** knowledge and belief, no other person, firm, corporation, or association had the right to use the mark in commerce….[23]  WIII contends that despite this sworn declaration, an April 24, 2011 email from one of B&P's partners, Michael Buchert, shows that B&P was "fully aware" of The Rum House New York prior to B&P's application to register the Mark.[24]  WIII therefore asserts that B&P "misrepresented its knowledge of the existence of another party's prior rights in the name and mark THE RUM HOUSE…" and "knowingly and willfully made false and/or fraudulent declarations or representations to the USPTO…" with "the intent to induce the USPTO to grant a registration to which [B&P] was not entitled."[25]  WIII concludes that "[b]ecause the sworn declaration submitted to the USPTO in connection with [the Application] contained material misrepresentations that were made with knowledge of their falsity with the intent to deceive the USPTO in order to obtain a registration, [B&P] fraudulently obtained Registration No. 3,776,555, and the subject registration should be cancelled."[26]  Accordingly, in addition to seeking to depose Mr. Grand regarding his conversations with Mr. Dang, WIII also seeks to depose him regarding his personal knowledge "of the existence of [WIII's predecessor] at the time he personally signed a sworn declaration as part of his client's service mark application."[27]

---

[23] R. Doc. 1-4, ¶ 26.  Emphasis added.

[24] R. Doc. 1-4, ¶¶ 28-29.

[25] R. Doc. 1-4, ¶¶ 34-36.

[26] R. Doc. 1-4, ¶ 37.

[27] R. Doc. 15, p. 10.

## II. Law and Analysis

### A. Rules 26 and 45 of the Federal Rules of Civil Procedure

35 U.S.C. § 24 provides, in pertinent part:

> The clerk of any United States court for the district wherein testimony is to be taken for use in any contested case in the Patent and Trademark Office, shall, upon the application of any party thereto, issue a subpoena for any witness residing or being within such district, commanding him to appear and testify before an officer in such district authorized to take depositions and affidavits, at the time and place stated in the subpoena. **The provisions of the Federal Rules of Civil Procedure relating to the attendance of witnesses and to the production of documents and things shall apply to contested cases in the Patent and Trademark Office.** (emphasis added).

Pursuant to this provision, subpoenas were issued from this district to both Grand and Johnson, "both of whom reside in this judicial district."[28]

Rule 45 governs the issuance of subpoenas, and provides that on a timely motion, the court for the district where compliance is required must quash or modify a subpoena that fails to allow a reasonable time to comply or subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A). "[O]n timely motion, the court of compliance must quash or modify a subpoena if it requires disclosure of privileged or other protected matter, or otherwise subjects the subpoenaed person to undue burden." *Porter v. Dauthier*, 2014 WL 6674474, at *1 (M.D. La. Nov. 25, 2014). *See also*, Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). "The moving party has the burden of demonstrating that compliance with the subpoena would be unduly burdensome." *Id*. (citing *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir.2004)). Subpoenas issued for discovery purposes, such as those at issue here, are also subject to the discovery limitations outlined in Rule 26(b). *See*, *Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 596 (E.D. Tex. 2003); 9A Wright & Miller,

---

[28] R. Doc. 1-1, p. 4. *See also*, R. Docs. 1-2 & 1-3.

Federal Practice & Procedure 2d § 2459 ("Of course, the matter sought by the party issuing the subpoena must be reasonably calculated to lead to admissible evidence as is required by the last sentence of Rule 26(b)(1).").

"Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).[29]  *See also*, *Lloyd Lifestyle, Ltd. v. Soaring Helmet Corp.*, 2006 WL 753243 (W.D. Wa. March 23, 2006) (applying federal rules of civil procedure to motion to quash deposition subpoena issued in conjunction with underlying opposition and cancellation proceeding pending before the UPTO Trademark Trial and Appeal Board); Trademark Trial & App. Bd. Man. Of Procedure § 402.01; *Joshua Domond v. 37.37, Inc.*, 113 U.S.P.Q.2d 1264 (PTO Jan. 2, 2015) ("The scope of discovery in a Board proceeding is governed by Fed. R. Civ. P. 26(b)(1)…."))  While "[t]he rules governing discovery are accorded a broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials….[d]iscovery does have 'ultimate and necessary boundaries.'" *Wilkerson v. Stalder*, 2015 WL 2236417, at * 2 (M.D. La. May 12, 2015) (citing *Hebert v. Lando*,

---

[29] Rule 26(b)(1) of the Federal Rules of Civil Procedure was amended on December 1, 2015 to clarify the scope of discovery.  The 2015 amendments "restor[e] the proportionality factors to their original place in defining the scope of discovery." Fed. R. Civ. P. 26(b)(1) Advisory Committee Notes (2015).  "The amendments to Rule 26 govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, in all proceedings then pending." *American Federation of Musicians of the U.S. and Canada v. Skodam Films, LLC*, 313 F.R.D. 39, 45 (N.D. Tex. 2015).  Given the "restorative nature" of the amendments, the court finds that application of the amended version of Rule 26(b)(1) is "both just and practicable."  *See*, *Williams v. U.S. Environmental Services, LLC*, 2016 WL 684607, at n. 2 (M.D. La. 2/18/16).

441 U.S. 153, 176 (1979) and quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

### B. Standing

Ordinarily, a party cannot object to a subpoena issued to a nonparty unless that party's objection is based upon some personal right or privilege in the subpoenaed information. *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 WL 29451, at *1 (M.D. La. Jan. 3, 2014) ("Ordinarily, Plaintiffs could not object to a subpoena issued to a nonparty. Nonetheless, Plaintiffs do have standing to raise objections to the subpoena directed to their former attorney because they claim a 'privilege with respect to the materials subpoenaed'—specifically, the attorney client privilege and work product protection.") (citing *Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979)); *Richardson v. Axion Logistics, LLC*, 2013 WL 5554641, at *2 (M.D. La. Oct. 7, 2013) ("if a Rule 45 subpoena seeks privileged information belonging to a party to the suit, that party has standing to challenge it, even if the subpoena is directed at a non-party"); *Stogner v. Sturdivant*, 2011 WL 4435254, at *6 (M.D. La. Sept. 22, 2011) (noting plaintiff has standing to "object to a Rule 45 subpoena directed to a nonparty on the basis of some personal right or privilege that she has in the requested records, such as the attorney-client privilege")).

B&P contends that "WIII's deposition subpoenas to B&P's attorney of record and nontestifying fraud investigator are thinly veiled attempts to mine B&P's privileged and work product protected information, forcing B&P to seek relief from this Court to protect its personal rights and privileges."[30] WIII does not oppose B&P's Motion to Quash on the basis of standing, and this court finds, based on B&P's assertion of attorney-client privilege and work product protections, that it has standing to object to the subpoenas issued to Grand and Johnson.

---

[30] R. Doc. 1-1, p. 4.

### C. Burden of Proof

The parties dispute who bears the burden of proof.  Generally, "[t]he moving party has the burden of demonstrating that compliance with the subpoena would be unduly burdensome." *Porter v. Dauthier*, 2014 WL 6674474, at *1 (M.D. La. Nov. 25, 2014) (citing *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004)).  However, B&P asserts that "WIII has noticed the deposition of B&P's lead counsel and a nontestifying expert, deponents for whom case law and the Federal Rules of Civil Procedure provide special protections…[a]ccordingly, WIII bears that burden."[31]

As discussed below, this court has previously applied *Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986) to determine the propriety of allowing opposing counsel's deposition.  *Hall v. Louisiana*, 2014 WL 1652791, at *4 (M.D. La. April 23, 2014).  This court has further explained that under *Shelton*, opposing counsel may be deposed only in "limited circumstances" and that "[r]egardless of the movant, *Shelton* makes clear that the party asking to depose its opponent's counsel bears the burden of proof."  *Id.*  The parties do not dispute that Grand is currently serving as B&P's counsel of record in the Cancellation Proceedings.  Accordingly, to the extent *Shelton* applies to Grand (discussed below), WIII bears the burden of proving his deposition is appropriate under *Shelton*.

As to Johnson, B&P has provided no authority for its position that the *Shelton* considerations should apply to Johnson.  The court finds that B&P, as the movant, bears the initial burden of establishing that Johnson is a non-testifying expert entitled to the protection of Fed. R. Civ. Proc. 26(b)(4)(D) or that compliance with the subpoena would be an undue burden or would require disclosure of privileged information under Fed. R. Civ. P. 45(d)(3)(A).  *See*, *U.S.*

---

[31] R. Doc. 1-1, p. 8.

*Inspection Services, Inc. v. NL Engineered Solutions, LLC*, 268 F.R.D. 614, 617 (N.D. Cal. 2010) (internal citations omitted) ("The party asserting an applicable protection bears the initial burden of showing that the protection applies.  Once that initial burden is met, the party seeking discovery from a non-testifying expert carries a heavy burden of proving the existence of exceptional circumstances.").

### D.  Subpoena to D. Scott Johnson

B&P characterizes Johnson as a non-testifying expert entitled to special protection under Fed. R. Civ. P. 26(b)(4)(D) and asserts that deposing Johnson would require disclosure of information protected by the attorney client privilege and work product protection, and that, alternatively, Johnson is entitled to assert a state law private investigator privilege.  In response, WIII states that it only seeks to depose Johnson as to his factual knowledge surrounding communications with Mr. Dang[32] and argues that even if Johnson was considered a consulting expert, it would still be entitled to take his deposition because "the information sought relates to Johnson's personal knowledge and factual representations" to Mr. Dang.[33]

#### 1.  B&P Has Not Established that Johnson is Entitled to Protection Under Fed. R. Civ. P. 26(b)(4)(D)

Pursuant to Fed. R. Civ. P. 26(b)(4)(D)(ii), a party may not ordinarily "by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial" unless that party shows "exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by

---

[32] R. Doc. 15, p. 27 ("Petitioner seeks only to question Johnson and Grand as to their factual knowledge surrounding two limited issues – communications with Mr. Dang and the truthfulness of the sworn declaration submitted with [B&P's] service mark application based upon the signatory's personal knowledge of the underlying facts.")

[33] R. Doc. 15, p. 9.

10

other means."   The rule "creates a safe harbor whereby facts and opinions of nontestifying, consulting experts are shielded from discovery, except upon a showing of exceptional circumstances." *Plymovent Corp. v. Air Tech. Solutions, Inc.*, 243 F.R.D. 139, 143 (D. N.J. 2007). *See also*, *Evans v. T.E, Ibberson, Co.*, 2013 WL 6796717, at *2 (E.D. La. Dec. 20, 2013) (26(b)(4)(D) "affords some protection to counsel who wish to obtain non-testifying experts to assist in trial preparation.").   As noted above, B&P bears the initial burden of establishing that Johnson falls within the scope of Fed. R. Civ. P. 26(b)(4)(D).   *U.S. Inspection Services, Inc. v. NL Engineered Solutions, LLC*, 268 F.R.D. 614, 617 (N.D. Cal. 2010).

In support of its Motion to Quash, B&P characterizes Johnson as a "consulting expert and licensed private investigator" and explains that Johnson is an "Associate Certified Fraud Examiner who worked for four years as a Financial Crimes Investigator for the Louisiana State Office of Financial Institutions."[34]   B&P explains that "[o]ne of the central claims of WIII's case is its claim to have made certain payments to Tejo, and B&P has claimed that WIII defrauded Tejo.   Johnson used his specialized knowledge, skill, experience, and training to help Grand evaluate the parties [sic] claims and defenses in this case."[35]   According to B&P, Johnson communicated with Dang twice and B&P has produced "complete, unredacted transcripts of all communications, totaling more than 60 pages" between Dang and Johnson.[36]   B&P states that although Johnson was identified in B&P's initial disclosures as an individual likely to have discoverable information, it

---

[34] R. Doc. 1-1, p 6.

[35] R. Doc. 1-1, p. 13.

[36] R. Doc. 1-1, p 6.

11

does not intend to call Johnson to testify and that Johnson has no independent factual knowledge of the Cancellation Proceeding.[37]

In support of B&P's characterization of Johnson as an expert, B&P attaches Johnson's "biography" – a screen shot of Bombet, Cashio, Darbonne & Associates' webpage entitled "About our Baton Rouge Private Investigators."[38]   Information regarding Johnson states that he is a "licensed investigator" who "gained his first experience in the field of investigations with a local legal investigations firm, specializing in background and accident investigations."[39]   The background information goes on to state that Johnson previously worked as a Financial Crimes Investigator and "is working to attain full certification in the field of fraud investigations."[40] Accordingly, the information provided regarding Mr. Johnson's "expertise" is not specific to B&P's retention and does not indicate whether he serves as an expert in fraud investigations or a private investigator for B&P in this matter.

In its initial disclosures, B&P identified Johnson as an individual likely to have discoverable information that B&P may use to support its claims and defenses in the Cancellation Proceeding and specifically identified Johnson as having information regarding "(i) Tejo Lounge, Inc's possible use and ownership of the mark THE RUM HOUSE; (ii) the establishment previously operated by Tejo Lounge, Inc., at the Edison Hotel in New York City; (iii) the purported assignment of the mark THE RUM HOUSE from Tejo Lounge, Inc. to Petitioner; (iv) Petitioner's purported ownership of the mark THE RUM HOUSE; (v) Johnson's communications with Thai

---

[37] R. Doc. 1-1, p. 2 ("Despite B&P's representations that (i) it does not intend to call Johnson to testify, and (ii) Johnson has no independent factual knowledge of this case – all he knows, he learned from either Dang or from privileged communications with Grand – WIII nevertheless seeks to depose Johnson.").

[38] R. Doc. 1-6.

[39] R. Doc. 1-6.

[40] R. Doc. 1-6.

Dang; (vi) Tejo Lounge, Inc.'s knowledge of Registrant's use of the mark THE RUM HOUSE; and (vii) Registrant's affirmative defenses."[41]   In discovery responses, B&P stated that "Chad Grand and Scott Johnson have conducted an investigation concerning the use, or lack thereof, of the mark THE RUM HOUSE by Tejo Lounge, Inc."[42]   The court considers investigation into the "use" of the Mark to be distinct from expertise in fraud.   Moreover, based on the court's review of the transcripts from Johnson's conversations with Dang, it appears to the court that Johnson was conducting himself as a private investigator attempting to gather factual information.   Although B&P asserts that it "hired Johnson for his expertise in fraud investigations," B&P presents no evidence to support that position.   B&P listed Johnson as an individual likely to have discoverable information in its initial disclosures[43] and WIII points out that prior to filing the Motion to Quash, B&P had "never referred to Johnson as an expert…."[44]   Moreover, although B&P is careful to present the argument in the alternative, it also asserts that Johnson is entitled to assert a privilege under Louisiana state law as a licensed private investigator.[45]   As discussed below, federal common law does not recognize a "private investigator's privilege."   The court finds that characterizing Johnson as a non-testifying consulting expert entitled to protection under Fed. R.

---

[41] R. Doc. 7, Exhibit H.

[42] R. Doc. 1-8, p. 9.

[43] R. Doc. 15, p. 12.

[44] R. Doc. 15, pp. 9-10.  B&P responds that a party is not required to disclose consulting experts.  *See*, TTAB Manual of Procedure § 401.03 ("Parties are not required to disclose consulting experts.").  The court does not find dispositive B&P's failure to list Johnson as an "expert."  Instead, the court focuses on B&P's description of Johnson's knowledge and activities in light of B&P's burden of establishing the applicability of Fed. R. Civ. P. 26(b)(4)(D) in the first instance.  *See*, *Bear Republic Brewing Co. v. Central City Brewing Co.*, 275 F.R.D. 43, 45, n. 2 (D. Mass. 2011) (declining to analogize party's listing of investigator in initial disclosures and later assertion that it did not intend to call investigator as a witness to situation in which party designates an expert witness and then re-designates that expert as "non-testifying" and explaining that "[d]isclosure from experts is specifically dealt with separately and comprehensively in Rule 26(b)(4)….There is no basis for applying that body of law to non-experts such as Mr. Staples.")

[45] R. Doc. 1-1, p. 14.  ("if the Court finds Johnson's deposition ought not proceed on any other grounds, the Court need not reach this issue….Under Louisiana law, licensed private investigators are bound to maintain client confidences.").

Civ. P. 26(b)(4)(D), especially in light of B&P's previous identification of Johnson as a fact witness, would run contrary to federal common law declining to recognize such a privilege.  *See*, *Ubiquiti Networks, Inc. v. Kozumi, USA Corp.*, 981 F.Supp.2d 1207, 1209 (N.D. Fl. 2013) ("Reason and experience do not support creating a federal common-law privilege for an investigator's work.")

### 2.  Private Investigator Privilege

B&P asserts that under the Louisiana Administrative Code, Title 46, Part LVII, § 709, Johnson may not reveal information relating to his representation and work as a private investigator.[46]  In support of its position, B&P characterizes "WIII's assertion that Tejo assigned trademark rights to WIII" as "essentially a contractual claim" "ordinarily governed by state law" and relies on Fed. R. Evid. 501 which provides *inter alia* that "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."[47]

"When considering a federal claim, federal courts apply federal common law, rather than state law, to determine the existence and scope of a privilege."  *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991).  *See also*, *Hall v. Louisiana*, 2014 WL 1652791, *4, n. 4 (M.D. La. April 23, 2014) ("Louisiana's Code of Evidence is inapplicable because: 'Questions of privilege that arise in the course of adjudication of federal rights are governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.'") (quoting *U.S. v. Zolin*, 491 U.S. 554, 562 (1989) (quoting Fed. R. Evid. 501)). Despite B&P's characterization, the court finds that federal law applies to the parties' proceedings

---

[46] R. Doc. 1-1, p. 14.  Pursuant to § 709(A), "[a]n investigator shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized to carry out the representation…."

[47] R. Doc. 1-1, p. 14.

before the Trademark Trial and Appeal Board and that federal common law governs the existence and scope of any potential private investigators' privilege.  *See*, Trademark Trial and Appeal Board Manual of Procedure, § 101.01 ("All proceedings before the Trademark Trial and Appeal Board ('Board') are governed by the Lanham Trademark Act of 1946, as amended, ("Trademark Act"), 15 U.S.C. § 1051 et seq….").

B&P does not cite to any federal common law establishing a "private investigator's privilege" and other courts have found no such privilege exists.  *See*, *Ubiquiti Networks, Inc. v. Kozumi, USA Corp.*, 981 F.Supp.2d 1207, 1209 (N.D. Fl. 2013) ("The common law has never recognized a private investigator's privilege.  Nor should it."); *U.S. Dept. of Educ. v. National Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007) ("But there is no private-investigator's privilege."); *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, 2013 WL 10936871, at *14 (E.D. Mich. Nov. 26, 2013) ("federal law supplies the rule of decision with regard to those cases and thus governs issues of privilege, and federal common law does not recognize a privilege with respect to private investigators.").  In short, B&P has failed to establish the existence or applicability of a purported private investigator's privilege.  *See*, *Clark v. Louisiana*, 2014 WL 3897659, at *4, n. 2 (M.D. La. Aug. 8, 2014) ("In any event, privileges are strictly construed as being exceptions to the general rule regarding the discoverability of relevant evidence and as being derogations from the search for the truth, and the party opposing production bears the burden of demonstrating the existence and applicably of the privilege.")

### 3.  Attorney Client Privilege & Work Product Protection

In addition to arguing that Johnson is a non-testifying consulting expert, B&P also asserts that "[a]s Grand's 'representative,' in the relevant legal sense, Grand's communications with

Johnson, and Johnson's work product, are and should be protected by the same attorney-client privileges and work product protections that Grand enjoys."[48]

### i.  Attorney Client Privilege

A party invoking the attorney-client privilege must establish: (1) that there was a communication between client and counsel; (2) the communication was intended to be confidential; (3) the communication was, in fact, kept confidential; and (4) the communication was made for the purpose of obtaining or providing legal advice.  *Bross v. Chevron USA, Inc.*, 2009 WL 854446, at *3 (W.D. La. March 25, 2009) (citing *U.S. v. Construction Products Research, Inc.*, 73 F.3d 464, 473-74 (2d Cir. 1996)).

With regard to the attorney-client privilege, the cases cited by B&P make clear that while the privilege may extend "to protect communications by the lawyer to his client, agents, or superiors, or to other lawyers in the case of joint representation," such protection is only warranted "if those communications reveal confidential client communications." *FEC v. Christian Coalition*, 178 F.R.D. 61, 66 (E.D. Va. 1998) (citing *U.S. v. Under Seal*, 748 F.2d 871, 874 (4th Cir. 1984)). Further, the cases relied upon by B&P clarify that "the privilege protects only confidential client communications; that is, communications not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by reasonably necessary means." *U.S. v. Under Seal*, 748 F.2d 871, 874 (4th Cir. 1984).  Similarly, the Fifth Circuit has instructed that "'the attorney-client privilege protects communications made in confidence by a client to his lawyer for the purpose of obtaining legal advice.'"  *King v. University Healthcare Sys., Inc.*, 645 F.3d 713, 720 (5th Cir. 2011) (quoting *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720 (5th Cir. 1985)).

---

[48] R. Doc. 1-1, p. 13.

The party invoking the privilege has the burden of demonstrating its applicability.  *King v. University Healthcare Sys., Inc.*, 645 F.3d 713, 720 (5th Cir. 2011) (quoting *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 720 (5th Cir. 1985)).  Although B&P asserts that Johnson is entitled to assert the attorney-client privilege as Grand's "representative," it has not explained how WIII's request to depose Johnson regarding the underlying factual basis for statements made during the course of Johnson's communications with Mr. Dang – a third party – would reveal ***confidential*** client communications.  Assuming *arguendo* that B&P was "feeding" Johnson "confidential" information through its attorney, Grand, B&P cannot establish that such communications were intended to remain confidential to the extent it anticipated that information would be relayed by Johnson to Dang.  As such, the court finds that B&P has not met its burden of demonstrating the applicability of the attorney-client privilege to Johnson.

### ii.    Work Product Protection

Pursuant to Fed. R. Civ. P. 26(b)(3)(A), "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party *or its representative* (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.)"  (emphasis added).  "It is not dispositive that some documents were not prepared by attorneys.  Rule 26(b)(3) protects from discovery documents prepared by a party's agent, as long as they are prepared in anticipation of litigation."  *Naquin v. UNOCAL Corp.*, 2002 WL 1837838, at *7 (E.D. La. Aug. 12, 2002).  *See also*, *Southern Scrap Metal Co. v. Fleming*, 2003 WL 21474516, at *6 (E.D. La. June 18, 2003) ("The [work product] doctrine protects not only materials prepared by a party, but also materials prepared by a co-party, or representative of a party, including attorneys, consultants, agents, or investigators."); *Colony Ins. Co. v. NJC Enterprises, LLC*, 2013 WL 1335737, at *2 (M.D. La. April 1, 2013) (same).  The party who is seeking the

protection of the work-product doctrine has the burden of proving that the documents were prepared in anticipation of litigation." *Colony Ins. Co. v. NJC Enterprises, LLC*, 2013 WL 1335737, at *2 (M.D. La. April 1, 2013).   Even if work product materials are ordered to be disclosed, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).   While "[w]ork product protection extends to documents and tangible things that are prepared in anticipation of litigation by a party or its representative, [the privilege] does not extend to the underlying relevant facts or to documents assembled in the ordinary courts of business."  *Williams v. United States Environmental Services, LLC*, 2016 WL 617447, at *4 (M.D. La. Feb. 16, 2016).

Viewing Johnson as a private investigator (rather than a non-testifying consulting expert), WIII is entitled to discover **facts** which were learned by Johnson during his investigation.  *See*, *e.g.*, *Bear Republic Brewing Co. v. Central City Brewing Co.*, 275 F.R.D. 43, 45 (D. Mass. 2011) (answering question of whether plaintiff could depose investigator in a trademark and trade dress infringement action "manifestly in the affirmative" and stating that plaintiff was "entitled to discover the facts which were learned by the investigator during the course of his investigation."); *Lexalt v. McClatchy*, 116 F.R.D. 438, 442 (D. Nev. 1987) (investigators hired by defendants could be deposed and were required to "answer questions which seek to discover all relevant facts in the case, regardless of whether those facts were discovered in their roles as defendants' investigators, or before those employment relationships were created.").   WIII asserts that it has not requested Johnson produce any documents or tangible things and instead only seeks Johnson's "factual knowledge."[49]   The court agrees that such factual knowledge is appropriately within the scope of

---

[49] R. Doc. 15, pp. 20-21.

discovery.  Accordingly, the court concludes that B&P has not met its burden of establishing that compliance with Johnson's deposition subpoena would be unduly burdensome or would require the disclosure of privileged information.  However, because "[t]he work product privilege protects intangible work product as well as what Fed. R. Civ. P. 26(b)(3) calls 'documents and tangible things,'" questions directed to an investigator during his deposition must be "'carefully tailor[ed]…so as to elicit specific factual material, and avoid broad based inquiries,…which could lead to the disclosure of trial strategies.'"  275 F.R.D. at 45 (internal citations omitted).

### E.  Subpoena to Chad Grand

Recognizing that Grand is enrolled as attorney-of-record for B&P in the Cancellation Proceedings, WIII asserts that "it seeks to depose Grand with respect to very limited topics, relating only to Grand's knowledge at the time he (not [B&P]) signed [B&P's] service mark application and his communications with third party witness Mr. Dang."[50]

#### 1.  *Shelton* Considerations

"Generally, federal courts have disfavored the practice of taking the deposition of a party's attorney; instead, the practice should be employed only in limited circumstances."  *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999) (citing *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir.1986)).  *See also*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 209 (5th Cir. 1999) (noting the *Shelton* analysis and affirming district court's authorization to take defense counsel's deposition).  "District courts in the Fifth Circuit, following *Nguyen*, have applied the three-prong test established by the Eighth Circuit in *Shelton* to determine circumstances when in-house counsel or other opposing counsel should be subject to being deposed…."  *McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co.*, 2016 WL 2609994, at *10 (N.D. Tex. May

---

[50] R. Doc. 15, p. 2.

6, 2016). *See also*, *Premier Dealer Services, Inc. v. Duhon*, 2013 WL 5720354, at *3 (E.D. La. Oct. 21, 2013) ("Courts in the Fifth Circuit have applied the three-prong test established by the Eighth Circuit in *Shelton*…to determine circumstances when in-house counsel should be subject to being deposed."); *Murphy v. Adelphia Recovery Trust*, 2009 WL 4755368, at *2 (N.D. Tex. Nov. 3, 2009) ("While the Fifth Circuit has not explicitly adopted *Shelton*, it has indicated that the same three factors inform a district court's discretion in determining whether to authorize the deposition of opposing counsel.").  Applying *Shelton*, this court has explained that "courts should only allow an opponent's counsel to be deposed in limited circumstances – *i.e.*, where the party seeking the deposition has shown that: (1) 'no other means exist to obtain the information than to depose opposing counsel;' (2) 'the information sought is relevant and nonprivileged'; and (3) 'the information is crucial to the preparation of the case.'" *Hall v. Louisiana*, 2014 WL 1652791, at *4 (M.D. La. April 23, 2014).

## 2. Applicability of *Shelton* to Grand

WIII asserts in opposition to the Motion to Quash that B&P "has not even shown that *Shelton* should apply to Grand, given its limited scope."[51]  It is true that "several courts within the Fifth Circuit have found that when an attorney's role in a case is more akin to a 'mere business advisor,' for a company in an action, he does not constitute 'opposing counsel,' and therefore *Shelton* factors do not warrant an application."  *Premier Dealer Services, Inc. v. Duhon*, 2013 WL 5720354, at *4 (E.D. La. Oct. 21, 2013).  *See also*, *Anserphone of New Orleans, Inc. v. Protocol Communications, Inc.*, 2002 WL 31016572, at 2 (E.D. La. Sept. 10, 2002) (finding *Shelton* inapplicable to deposition of transactional lawyer who negotiated agreement at issue in pending lawsuit, notwithstanding that the attorney's firm represented the same client in the litigation).

---

[51] R. Doc. 15, p. 8.

"[T]he critical factor in determining whether the *Shelton* test applies is not the status of the lawyer as 'trial counsel,' but the extent of the lawyer's involvement in the pending litigation." *Murphy v. Adelphia Recovery Trust*, 2009 WL 4755368, at *3 (N.D. Tex. Nov. 3, 2009). "[I]f the lawyer is actively involved in trial preparation, [he] cannot be deposed unless the *Shelton* criteria are met." *Id*.

In support of its position that B&P has not shown *Shelton* should apply, WIII relies on case law in which the attorney whose deposition was sought was not serving as trial counsel or involved in trial preparation. *See*, *U.S. v. Philip Morris, Inc.*, 209 F.R.D. 13, 18 (D.D.C. 2002) ("unlike *Shelton*, the proposed deponents here are not litigation or trial counsel."); *Anserphone of New Orleans, Inc. v. Protocol Communications, Inc.*, 2002 WL 31016572, at *2 (E.D. La. Sept. 10, 2002) (noting proposed deponent was "not involved in trial preparation."); *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 380 (D.D.C. 2011) (*Shelton* inapplicable to attorney who served as counsel in completed patent reexamination and who was neither serving as trial counsel or providing any sort of litigation support). In light of Mr. Grand's role as B&P's counsel of record in the ongoing Cancellation Proceeding, the court finds that the *Shelton* criteria are applicable, notwithstanding his pre-litigation action of signing B&P's Application. *See*, *McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co.*, 2016 WL 3033544, at *6 (N.D. Tex. May 26, 2016) (declining to apply a "prelitigation-knowledge exception to the *Shelton* test's applicability to a party's trial counsel."). Because *Shelton* applies, WIII bears the burden of proving no other means exist to obtain the information sought other than deposing Grand, that the information WIII seeks is relevant and not privileged, and that the information sought is crucial to WIII's case preparation. *Hall v. Louisiana*, 2014 WL 1652791, at

21

*4 (M.D. La. April 23, 2014) ("Regardless of the movant, *Shelton* makes clear that the party asking to depose its opponent's counsel bears the burden of proof.").

### 3.   Investigation Regarding Tejo

WIII states that "Grand and Mr. Dang emailed each other and spoke to each other by telephone.  The emails have been produced in discovery."[52]  However, WIII argues that statements made by Grand to Dang likely affected Dang's deposition testimony and therefore WIII is "entitled to explore communications between a key third party witness" and Grand.[53]

With regard to the *Shelton* considerations, this court disagrees that "Grand is the only source" of the information WIII seeks.[54]  WIII admits that the emails between Grand and Dang have been produced and that Dang has been deposed.  To the extent WIII believes Grand's discussions with Dang unduly affected Dang's testimony, the court finds that the cross-examination of Dang, rather than the deposition of B&P's attorney of record, may be used to explore that issue.  Moreover, the court notes that with respect to Dang, WIII's opposition to the Motion to Quash is focused on Johnson's (rather than Grand's) conversations and the "leading questions" WIII argues were used by Johnson when communicating with Dang.  WIII does not contest that complete, unredacted transcripts of the two conversations between Johnson and Dang have already been produced.  As discussed above, this court finds that WIII is entitled to depose Johnson regarding the facts learned by Johnson during his investigation.  Accordingly, the court finds there are other means by which WIII can obtain the information it seeks regarding any potential influence upon Dang's deposition testimony.

---

[52] R. Doc. 15, p. 1.

[53] R. Doc. 15, p. 2.

[54] R. Doc. 15, p. 11.

Further, "[c]ourts have consistently recognized that investigation may be an important part of an attorney's legal services to a client," *In re Allen*, 106 F.3d 582, 602 (4th Cir. 1997), and this court will not condone the deposition of a party's attorney regarding the undefined "factual basis" for communications with Dang when such questioning could reveal the attorney's thought process and litigation strategy. *See*, *Shelton*, 805 F.2d at 1328 & 1329 (explaining that the "work-product doctrine not only protects from discovery materials obtained or prepared in anticipation of litigation, but also the attorney's mental impressions, including thought processes, opinions, conclusions, and legal theories" and finding that the "mere acknowledgement of the existence" of documents that counsel has compiled in preparation for litigation was protected work product). While the information WIII seeks from Grand appears to be relevant, the court finds that WIII has not established that such information is non-privileged.

Finally, because the court finds that any underlying "factual basis" for Mr. Dang's testimony can be traversed via cross-examination of Mr. Dang and the deposition of Johnson, it also finds that the information WIII seeks from Grand regarding his conversations with Dang is not "crucial" to WIII's preparation of its case. *See*, *Hall v. Louisiana*, 2014 WL 1652791, at *5 (M.D. La. April 23, 2014) (finding information sought via deposition of counsel was not "crucial" to plaintiff's case because those claims could be proved through circumstantial evidence).

### 4.  WIII's Fraud Claim

In addition to deposing Grand regarding his communications with Dang, WIII also seeks to depose him regarding his personal knowledge supporting the declaration that all statements in the Application were true or believed to be true.[55]  WIII argues that Grand is a fact witness as to this issue and that B&P has taken the position in the Cancellation Proceeding that it is Grand's –

---

[55] R. Doc. 15, p. 2.

rather than B&P's – knowledge that is relevant to WIII's fraud claim.  As WIII explains, it "does not seek information relating to what [B&P] or its principals told their attorney before he prepared the service mark application, or how Grand advised his clients, but what Grand's actual knowledge of the underlying facts was, regardless of how that knowledge was obtained…."[56]

WIII argues that B&P has "tacitly admitted" that it is Grand's personal knowledge, rather than B&P's knowledge, that is relevant to WIII's fraud claim in the Cancellation Proceeding.[57] Specifically, WIII points to B&P's Motion to Dismiss filed in the Cancellation Proceeding wherein B&P argued that WIII's fraud claim should be dismissed because "WIII has failed to allege that the person who signed the declaration, namely B&P's attorney Chad Grand (the "Declarant") was aware of the existence of the Times Square Establishment at the time the declaration was signed."[58]

With regard to the first and third *Shelton* considerations (*i.e.*, whether there are other means to obtain the information and whether the information sought is critical to WIII's case preparation), the court notes that at least one circuit court has held that a claim of fraud on the PTO based on the veracity of an applicant's declaration hinges on the personal knowledge of the declarant.  *See*, *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes and of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta*, 702 F.3d 1279, 1290 (11th Cir. 2012) (holding that district court clearly erred in finding Plaintiff Order fraudulently obtained its mark where individual who had signed the application on behalf of Plaintiff Order was not "personally aware" that any other organization was using the

---

[56] R. Doc. 15, p. 16.

[57] R. Doc. 15, p. 10.

[58] R. Doc. 7, Exhibit N, p. 9.  *See also*, R. Doc. 7, Exhibit N, p. 14 ("WIII has failed to allege that the person who signed the declaration, Chad Grand, knew of the Times Square Establishment at the time the declaration was signed….").

mark at issue because "[t]he declarant-focused text of the application oath requires the signatory's good-faith, subjective belief in the truth of its contents.").

B&P relied on *Sovereign Military* to support its Motion to Dismiss in the Cancellation Proceeding.[59]   However, in denying B&P's Motion to Dismiss in the underlying Cancellation Proceeding, the Trademark Trial and Appeal Board (the "Board") found that "[t]he fact that [WIII] has not alleged that [B&P's] attorney, the declarant in the application for the involved registration, knew of Petitioner's superior rights does not render the fraud claim insufficient."[60]   The Board explained that "[w]hile a party's attorney may sign an application declaration even though he has no personal knowledge of the facts averred therein, the attorney's averments, like those of a corporate officer, must be based on the information available to [B&P] itself."[61]   Further, the Board stated that "[e]ven if the declaration was prepared by its attorney, [B&P] must be held accountable for any false or misleading statements made therein" and similarly, "because a corporation is accountable for its officers' false or misleading statements, [B&P's] partner Michael Buchert's knowledge of Petitioner's prior use of the involved THE RUM HOUSE mark would impute to [B&P]."[62]   Accordingly, although there is weight to the contrary, the court finds that based on the Board's ruling on B&P's Motion to Dismiss, deposing Grand is not the only means by which WIII may obtain the information it needs to support its claim.[63]   *See, In re Bose Corp.*, 580 F.3d 1240 (Fed. Cir. 2009) (holding that a "trademark is obtained fraudulently under the Lanham Act only if

---

[59] *See*, R. Doc. 7, Exhibit N.

[60] WIII Uptown, LLC v. B&P Restaurant Group, LLC, No. 92059889 (TTAB, Oct. 2, 2015), accessed Sept. 1, 2016: http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=92059889&propno=&qs=&propnameop=&propname=&pop=&pn=&pop2=&pn2=&cop=&cn=

[61] *Id*.

[62] *Id*.

[63] As noted above, WIII has noticed the depositions of B&P's principal, Michael Buchert, and B&P's 30(b)(6) deposition.  WIII also states that the deposition of Kelly Ponder, B&P's other principal, has been noticed.  R. Doc. 1-1, p. 7.  However, the attached exhibits do not include a deposition notice for Mr. Ponder.

the applicant or registrant knowingly makes a false, material representation with the intent to deceive the PTO" and noting that "'because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.'") (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). *See also*, *Murphy v. Adelphia Recovery Trust*, 2009 WL 4755368, at *4 (N.D. Tex. Nov. 3, 2009) ("The availability of corporate representative with knowledge of relevant facts is a viable alternative to the deposition of counsel."); *McKinney/Pearl Restaurant Partners, L.P. v. Metropolitan Life Ins. Co.*, 2016 WL 3033544, at *6 (N.D. Tex. May 26, 2016) (granting motion to quash attorney deposition subpoena where plaintiff failed to show that it tried and failed to obtain information from another source, such as defendants' corporate representative(s)). *Cf.*, *Rainbow Investors Group, Inc. v. Fuji Trucolor Missouri, Inc.*, 168 F.R.D. 34 (W.D. La. 1996) (denying plaintiff's motion to quash deposition of plaintiff's counsel where underlying transaction at issue in the suit was handled by plaintiff's counsel of record, and defendants demonstrated *inter alia* their efforts to obtain the information from other sources including the deposition of plaintiff's president.).

With regard to the second *Shelton* consideration – whether the information sought is relevant and non-privileged – the court finds that B&P's pleadings in the Cancellation Proceeding run dangerously close to qualifying as a waiver of any potentially applicable privilege. However, "[w]aiver occurs only when the privilege-holder 'will be *forced inevitably to draw upon a privileged communication* at trial in order to prevail.'" *Dixie Mill Supply Co., Inc. v. Continental Cas. Co.*, 168 F.R.D. 554, 557 (E.D. La. July 10, 1996). *See also*, *Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC*, 2014 WL 29451, at *6 & 7 (M.D. La. Jan. 3, 2014) (noting that a party may waive both the attorney-client privilege and work product protection by placing protected communications or materials "at issue" and explaining that the "at issue" waiver is

"rooted in fairness—when the holder places the information at issue to his own benefit, allowing 'the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.' Ultimately, the question is whether the privilege holder has committed itself to a course of action that will require the disclosure of a privileged communication.") (quoting *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989)). Here, as discussed above, the Board has held in the underlying Cancellation Proceeding that it is *B&P's* knowledge, rather than Grand's, that is placed at issue by WIII's fraud claim. In light of this Circuit's general disfavor of depositions of opposing counsel, unless and until that standard is modified or B&P attempts to call Grand as a witness to defend WIII's fraud claim, the court finds that WIII has not sustained its burden of showing that Grand's deposition is appropriate under *Shelton* at this juncture of the Cancellation Proceedings.

## III. Conclusion

For the reasons set forth herein, the Motion to Quash[64] is **GRANTED** as to the deposition of Chad Grand and **DENIED** as to the deposition of D. Scott Johnson. B&P's request for oral argument[65] is **DENIED AS MOOT**.

Signed in Baton Rouge, Louisiana, on September 2, 2016.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[64] R. Doc. 1.

[65] *See*, R. Doc. 1, p. 1.